Please the court, Gerald Salcedo on behalf of Appellant Claudio Burgos. If I could, I'd like to reserve two minutes for rebuttal. The impounding of Mr. Burgos' truck in this case was not justified by the community caretaking exception. This case is materially indistinguishable from this court's recent decision in Cervantes. The government provided no evidence in the district court that Mr. Burgos' truck was parked illegally, posed a safety hazard, or was vulnerable to vandalism or theft. And just like in Cervantes, the government presented no community caretaker evidence to justify the impoundment. In fact, although Mr. Burgos specifically raised in his motion to suppress the lack of a community caretaker exception, the government did not address the caretaking exception in the district court with any evidence, no declarations, no exhibits, no oral argument, no testimony. Instead, it appears that the government and Deputy Tallis justified the impoundment of Mr. Burgos' car on the California Vehicle Code, which allows an officer to impound a car when that person is driving without a license. Can you explain to me, I'm looking at the CHP 180 form, an excerpt of Record 93, and the storage authority or reason box cites to Vehicle Code section 22655.5, which as I read, the Vehicle Code deals with impounding cars that are instrumentalities or evidence of the crime. Was there any testimony below that was given in aid of the impoundment of the vehicle since it contained drugs? Well, Your Honor, I think what happened is after the fact, they found drugs and then were able to, they switched from an unlicensed driver to Vehicle Code that allows you to impound the car. Well, it was not an unlicensed driver. There was a warrant out for him. Yes. Yeah. As well. As well, yeah. So we still, I think your point is that we still have to look at the lawfulness of the manner in which the contraband was found. Yes. Okay. Because it did find... Because assuming that the search was lawful, whether it was under an inventory search or some other justification, at that point there would be probable cause to both arrest him for the drug violation and impound the vehicle as... Instrumentality. Instrumentality of that crime. Yes. Okay. Well, the whole thing here was you had this surveillance, they saw your client go in, they saw him come out with a bag. Yes. They were surveilling what they suspected was a home used to supply vendors of drugs. And that's what they were doing. Why were they there? That's why they were there. You had a DEA agent, right? He wasn't looking for an ice cream parlor. And you had a deputy sheriff. And then they had a black and white vehicle with another deputy sheriff that was Tellez, just a few minutes away, just three short blocks away. And so they see the guy come out and then he goes and he gets into the vehicle, which was a pickup truck. Yes. And then they ask Tellez to follow him. Yes. And see if they can't find a way to legally stop him. Right? Yes. You know, it's easy. You know, they cross the lane. And so there are lots of ways of approaching this. You have the traffic stop matter. You have the vehicle exception. You have the caretaker exception, right? Yes. You even could have had a knowing that there were criminal activity afoot exception. You could have had that too. But the government didn't come up with anything. The only thing they focused on was the community caretaking exception. I'm not, you know, I want them to think about what I'm asking, not you. That's the problem with this case, is that they clearly didn't think they had sufficient probable cause just to stop him based on the surveillance. So they needed to get a warrant. Instead, they did a pretextual violation, which was the lane switch, and then argued that they could lawfully impound the car under community caretaker exception. But then they didn't prove up the community caretaker exception. So I think we have to look at whether, as an initial matter, whether they did prove up the community caretaker exception. And then that was the basis for Judge Rill's ruling, was community caretaker. Without any, yes, without any real analysis, however. They weren't thinking about all that. So, you know, so do we say, do we reverse? Because they didn't prove up community caretaker, and that's what Judge Rill relied on. And then you have to have a basis for the search. There was no warrant. So what was the basis for the search? They argued the lawful impounding of the car. But if that's not there, they, I mean, I guess there's no evidence that they had sufficient probable cause to stop the car. Otherwise, they wouldn't have done the, pulled the motor out of the lane change. There's no evidence that the government put forward that they thought they had probable cause to pull over Mr. Burgos' truck. Let me ask you a question under vehicle code section 14602.6A1. Yes. As I understand the statute, it empowers a peace officer who arrests the driver for driving while his driving privilege has been suspended or revoked to impound the vehicle. I assume that's a discretionary call as to whether he does or does not. Yes. And in this instance, there was nobody else that he could turn the car over to, at least at the scene of the stop. That's correct. Okay. But then I guess we're back to the issue that we've been questioning you about. You know, do they then have to prove under the community caretaking function that they needed to impound the vehicle? And my question is, do they have to do that? Or does this provision of the vehicle code permit the impoundment without regard to whether or not it meets our community caretaking function case law? Well, the question isn't, is the search authorized by state law? The question is always. No, no. As I read the statute, it basically says the peace officer may either immediately arrest that person and cause the removal and seizure of that vehicle. I mean, to me, that says that's all you need. You don't have to show that leaving it there is a danger to the community or that it might be, you know, subject to theft or vandalism. The statute empowers the officer to impound. Why doesn't that end legally? It does, and I believe that's what the deputy tell us and the government relied on, is that very clear language. But state law doesn't govern whether or not you can seize a car. It's well settled that the search has to be reasonable under the Fourth Amendment, and that search is reasonable under the Fourth Amendment. So are you challenging the constitutionality under the Fourth Amendment of that provision of the vehicle code? Is that what we're doing here? I think. Because the vehicle code clearly empowers the officer to seize the car. Yes. I mean, I suppose one justification would be because his license has been suspended or revoked, and by driving the vehicle he's committing another criminal offense, driving while his license is suspended or revoked. So it, too, is the instrumentality of the crime. Yes, Your Honor. And the same facts came up in Cervantes. The driver was unlicensed, and in that case it was because the government wasn't able to prove the caretaking reasons or articulate caretaking reasons to seize, to impound the vehicle, that that search was not held up. But I'm not sure the panel addressed the question I'm asking you, and I don't know if the state or the, I guess it was the federal government in that case, made this argument that, in essence, the statute says we can do it if we've arrested the driver. That's very well and true, Your Honor. It's just our position that the federal law is what governs the seizure of the vehicle. And if you can prove, if you can articulate, if the officer can articulate that the vehicle posed a hazard or was subject to vandalism or theft or some other caretaking reason, then you can go ahead. But that's a different question, isn't it? I mean, let's take a non-statutory impoundment. A person is stopped for suspicion of driving under the influence and is taken into custody. The DWI statute doesn't say anything about impounding the car, does it? I haven't looked at the statute recently. I don't think it does. So there it seems to me that community caretaking function is an issue. Can the vehicle be safely left at the side of the road while the driver is taken down to the station for processing? Yes. Here, the statute specifically authorizes the peace officer to impound if he's making a full physical custody arrest. It does. And so what's your answer? Pardon me? What's your answer? My answer is that federal law governs. And you have to have a caretaking exception before you can impound that car. State law is state law. So you are making a constitutional challenge to the way that the California statute is written. You're saying that unless we engraft Fourth Amendment community caretaking function law into the statute and make that a condition to impoundment, the statute is unconstitutional on its face. Yes. I didn't understand that from your brief. I guess I'll have to look at that again. Okay. Isn't that the police? That's Cervantes. That's one of my cases. Yeah. No, I've never met Cervantes. Very well written, Judge Ferguson. Thank you. So the statute that he was says whenever a peace officer determines that a person was driving a vehicle without ever having been issued a driver's license, the peace officer may immediately arrest and cause the removal and seizure of that vehicle. That wasn't the case here, was it? I believe it was the case, Your Honor. That he never had a driver's license? I don't remember in the record him ever having a driver's license. In fact, he was ‑‑ I thought his license was suspended, and that's why he was driving without a license. No, I think he has a previous warrant for driving without a license. A previous warrant, yeah. Didn't he tell Deputy Tellis when he stopped him, when he asked him for his driver's license? He said, I don't have one. It's been suspended. And then Tellis checked it out, and he said, well, you've got a warrant, too. Yes. For your, you know. Of course, he had discretion then whether to arrest him or not arrest him. So he arrested him. Put him in handcuffs. Put him in the back of the black and white. And, you know, we don't even know about the location. You read part of this record, and you can get the impression that they were on a freeway and that Tellis saw him get off the freeway and then get on to wherever the street is, and that he made an illegal lane change. But we don't know anything about the neighborhood or any of that. Then you have another one where you can somehow believe that, well, they were driving along this street that perhaps paralleled the freeway, and then he made a right, then the driver made a right turn and then made this lane change without signaling. But we don't, we're not quite sure where all of this happened. So then there was a resort to Google Maps, which still doesn't. Google Maps doesn't help because it, well, also the picture could be months before the way Google works, as the picture could be of the place, months, years before the actual day of the events or even of today. That's how they put up their pictures. So it's really not helpful. And it doesn't show the exact location of where the car is, so you can't analyze the characteristics of where it was parked. But it's a danger to the public to, I mean, if you look at those factors. In the district court, there was no government witness ever explained why the impoundment of Mr. Telles' car was necessary under the circumstances. Deputy Telles did not testify that the truck would have been vulnerable to vandalism or theft, posed a safety hazard, or otherwise impounded the car, the truck, for any caretaking provision. As in Cervantes, the government has not met its burden. To show that the community caretaker exception to the Fourth Amendment justifies an impoundment. So we don't know whether the vehicle was an impediment to traffic, a threat to public safety and convenience, target for vandalism or theft. And then the government attempted to supplement the record with Google Maps street view images. It's the government's burden to establish the constitutional reasonableness of the seizure and subsequent inventory search. So why don't you take a little rest, we'll hear from the government. Good morning, Your Honors. May it please the court. Asha Olivas on behalf of the United States. Knowing that this court is already familiar with the facts and law and has plenty of questions, I will immediately turn to answering those questions for the court. Okay. Which one do you want to take first? Your Honor, if I could begin with the first central question in the case. Was the impoundment of the vehicle objectively reasonable under the community caretaker exception to the Fourth Amendment? So do you disagree with my reading of the statute that it doesn't matter? Is it your understanding that Cervantes says that you do have to demonstrate the community caretaking function even though the statute authorizes impoundment on its face? The answer to that question, Your Honor, is twofold. One, it is the government's position that the statute authorizes the impoundment on its face. However, it is also the government's understanding that there has to be a Fourth Amendment requirement met as well, and that does require a showing of the community caretaker or some other exception to the warrant requirement in addition to the statute itself. And the government feels that here that has been adequately proven in the district court level. Okay. So what evidence is there in the record at the district court level that the vehicle impeded traffic, threatened public safety, or was at risk for theft or vandalism? Your Honor, the evidence is manyfold. First of all, the traffic stop occurred on Eagle Rock Boulevard approaching El Paso Drive. While it is true that the exact precise location was not described, that ---- But you know something? That doesn't mean anything to me. I've been to Paris more often than I've been to Eagle Rock. I have no idea. And I'm from Seattle. I've never been to the neighborhood at all. Well, we pass by it when we come here. And it's a nice place. Occidental College is there. See, I have been on Eagle Rock Boulevard. I don't know where the car was stopped. Your Honor is right. Eagle Rock Boulevard is a large boulevard. And the area of town, even though I, too, am from another state and I'm geographically challenged in that regard, we do know from the record that the officer was from the East Los Angeles Station and took the defendant there afterwards. So we know that Eagle Rock Boulevard, though, whether or not ---- Where is the East Los Angeles Station? The East Los Angeles Station, Your Honor. Can I grab another binder to give you the address? Oh, yeah. Because I'm from East Los Angeles. I'll avoid that location. At least don't get stopped there. The East Los Angeles Station, Your Honor, is at 5019 East 3rd Street, Los Angeles, California, 90022. Well, five, what's that again? Five. And, Your Honor, it's also listed at ER 93 on the CHP 184. That's okay. Where is it on 3rd Street? 5019. 5019. East 3rd Street. East 3rd Street. Los Angeles, California. Okay. 90022. East 3rd Street. So that means that it's 50 blocks east of Main Street. It's a long, long distance. See, I used to live at an address that was 1927. And then another one that was 3341. 1927 was fewer than 20 blocks from downtown. Short blocks. So this is pretty far out. So I don't, you know, I mean. I have so many questions about this case because it seems to me they had an entirely legitimate way of getting into that track. And even the police report by Tellez says, Deputy Tellez stated that in addition to the probable cause developed by the surveillance. Okay, stop there. If you had probable cause from the surveillance, why not go get a warrant? You know what truck he's in. Okay. And then it says, in addition to probable cause, if he had probable cause, then he certainly should have had reasonable suspicion. So he could have done a Terry stop. And then it says it is his department's policy to witness an independent vehicle violation in order to make traffic stop. To create. I mean, that sounds very bizarre to me if that's really their policy. And then he arrested him only after he learned about the warrant. I don't understand. Is that really their policy? The LAPD's policy that if you have probable cause, which is more than reasonable suspicion to stop a car, you have to also find an independent traffic reason. Your Honor, it is my understanding that that is the Los Angeles Sheriff's Department policy. Isn't that a little crazy? If you have a constitutional basis to stop the truck anyway, why do you have to have your officers make up some traffic violation? Certainly the policy doesn't require manufacturing a traffic violation, but to wait until, if any, if that particular officer has an independent basis for making the stop. But that's so ridiculous. Because if you actually have reason to believe that Vargas is driving away with a bunch of marijuana in his truck, why would you have to wait until he also commits a traffic violation to stop him? And here, Your Honor, the concern was a large amount of heroin. And they did have. Okay. So isn't that, that's really terrible. This guy's traveling through town with a large amount of heroin. They at least are on reasonable suspicion of that, right? Why did they have to go through all this other stuff and, you know, wait until he changes the lane without flashing his light? Which he says he did. So, I mean, you know, obviously the district court bullied the police. But maybe I'm just, as a matter of policy, it just seems so wrong. You know, as a matter of public safety, it just seems so wrong. I just don't even understand that. Your Honor, I understand your concern. And you're right. Here there were multiple bases to properly stop the vehicle. Here, in accordance with the Los Angeles Sheriff's Department policy, they wait until they also had personally observed an independent reason that would be beyond question, frankly, that a traffic stop obviously gave the officer discretion to stop the vehicle, which he did, and to approach the passenger and to thereby request his license, which the defendant was unable to provide because, as this Court has already noted, he had no license and had previously issued a warrant for driving without a license. But this whole case has proceeded under the community protection doctrine, nothing else. So you still haven't answered my question. What evidence in the record shows that impeded traffic, threatened public safety, or risk of theft or vandalism from just leaving the car there? Your Honor, yes. And if I could get back to that multi-pronged answer as well. As I was beginning, Eagle Rock Boulevard, in of itself, being a boulevard, by definition, is a major thoroughfare. Is that in the evidence? The name of the street, Eagle Rock Boulevard, yes. The name of the street alone. Right. Nothing about the nature of the street. The nature of the street was not described, Your Honor. That amount of traffic on the street. And that it was approaching the intersection of El Paso Drive. But what about the time of day? It was in the record, Your Honor, that this occurred at about 335 p.m., late in the afternoon. And it's also in the record, and just to clarify one point on that first point about where the vehicle was stopped, in the reply brief, the defendant raises the concern that, well, we don't even know if it was Eagle Rock Boulevard or El Paso Drive. But the officer is clear throughout the record that that is where the stop occurred. And it's also clear in the record that that is where the tow occurred. So we do know that it was on Eagle Rock Boulevard. A boulevard by its own Webster's dictionary is a major thoroughfare. And we know that it's inherently a public and exposed street. And it's also in the record that that was nowhere near the defendant's home. And as the court is already aware, there are pretty much two lines of cases on this point. There's a very long line of case law, going back to Cady, the Supreme Court decision in the 70s, and Opperman, that specifically say that the standard is if it's on an exposed street and you're leaving an abandoned vehicle, that in itself creates a nuisance. But what do we know about, like, parking on Eagle Rock Boulevard, whether parking is allowed at that time of the day, whether it's lawfully, you could lawfully park the car there? What do we know about that? The government admits that the parking regulations or restrictions were not discussed at the district court level. And similarly, I would point out that there's also a long line of cases where the defendant is parked in a parking lot. Have you been driven on Colorado Boulevard? I have, Your Honor. Do you see the cars parked on both sides of it? Yes, Your Honor. Okay. So to me, when you start making these arguments about boulevard, I'm thinking, well, you can park on both sides of Colorado Boulevard. That's a boulevard, by definition, a big public street. Yes. And just because you can park there doesn't mean that you can abandon a vehicle there, which are the two separate. Well, who says the car is abandoned? Excuse me? Who says the car is abandoned? Well, we do know from the record that. Was he given the opportunity to call someone else to come pick up the car? No, he was not given that opportunity. It is clear in the record that there was no other licensed driver in the vehicle that he was the sole occupant. But you still couldn't call someone to come pick up the car. There's also a long line of case law that says that the officer doesn't have to pursue the least intrusive alternative. He doesn't have to provide the defendant an opportunity to call someone else to pick up the vehicle. And also in this record, it should be noted, because it's an important fact on this point, that the defendant was not even the registered owner or the legal owner of the vehicle. The deputy had checked the status of both. The registered owner lived in Lancaster, which is in the record at ER 92. And the. Well, he said he bought it, didn't he, 20 days earlier? He claimed that he bought it after the fact in an interview 20 days earlier. But there was no documentation that he provided to the officer of that fact at that time. And in addition to going down a long list of facts that Your Honor had asked about, as the court pointed out earlier, the facts also show that the defendant had just exited a freeway and was on Eagle Rock Boulevard, also indicating that it was not a residential street. But was it black and white, sheriff's vehicle? Was that on the freeway? The officer, I believe, was on the freeway. He saw the defendant exit. There's not a word that I've seen that puts the officer on the freeway. Just said he's. I think he saw the vehicle exit the freeway and that he was. And he turned, gives you the turns he made, the turn north. And it sounds like one big coincidence. Your Honor is correct. He does begin at ER 91 with traveling on the northbound Eagle Rock Boulevard. However, if I could also point in the record on ER 66, Deputy Teller stated that after the driver exited the freeway onto Eagle Rock Boulevard, he observed Burgos change lanes without exiting. Your Honor is correct that it isn't clear where the black and white was located, just that he had observed that route of travel of the defendant. And if I could continue on the many factors that were detailed in the evidence, I would also add that it is in the record that the deputy had 11 years of daily practice and training in this area. That doesn't mean anything. Well, that it had been his experience to, that it was his both policy and procedure under the law to impound a vehicle that was going to otherwise be abandoned on a public street when there was an unlicensed driver and no other driver to drive. He had two cell phones. Obviously he could have called someone to come pick up the vehicle. Your Honor, that's correct. He did have the cell phones with him. He was being arrested. It is not and it's never been part of the case law that that's a requirement on the officer's part. In fact, the case law is to the contrary. I'm sorry, Your Honor. I mean, how do we know the car was abandoned? Well, we do know that at that moment he was being arrested on an outstanding warrant and there was no other driver in the vehicle. So the car was going to be left there for an undetermined amount of time. Well, then he'd be able to call someone from the police station, right, and tell them to go get the car? It's possible that he could have, but at that moment he was going to be leaving the vehicle. And that brings me back. But I mean, how do we know that the vehicle, if the vehicle were parked, was left parking where it was, that it wasn't going to obstruct traffic? Or a threat to public convenience or safety? Or a target for vandalism or theft? I mean, the government has that burden, right? Yes, Your Honor. You have the burden. So we don't know anything about that. There's nothing in the evidence that tells us that. We know that this gentleman was very cooperative. He just right away said, I don't have a license. I mean, he wasn't. The officer ran a make on him and found out there was a warrant. And he got out of the vehicle and was, you know, handcuffed and put him in the car. So that's, we don't know whether it was legal for him to park there or not. Right. I mean, he could have, he could have, at least when he got to the station, he could have made a phone call to someone and said, pick up the car and just drive it home or wherever. Because if you put it in there in impoundment, then in certain circumstances they keep it for 30 days. Runs up a big bill. And so, but that was the only argument. Well, that was the only argument that the government made. Your Honor. That was the impoundment argument, public safety argument. Isn't that right? That's correct. There is a long line of case law, such as the Ramirez. We've been a park case, the Hallstrom case. You don't have to cite the case. Where cars are legally parked in a parking lot. But you didn't. Well, we had one, another one of my cases where they were going to, the case, the guy was parked right by his house. And they were getting ready, whatever the impoundment was. And it was on a, it was a wide street. It was there. There was nothing illegal about parking it by his house. Your Honor, you bring up a good point. I would like to distinguish this case from the long line of cases like Miranda and Caceres, where that really is the only distinguishing factor from the long line of cases that say that so long as the car is exposed in a public area, it's inherently vulnerable to vandalism or theft. In the Caceres case that Your Honor is likely referring to, that person had already parked his car and was exiting his car and walking towards his residence, which was two doors down when the officer stopped him and then was going to impound the vehicle. Here, though, the officer had created the situation. He had, by turning on his lights, had the car pull over to the side of the road and thereby gave a duty. He had a duty to safeguard the vehicle that would have otherwise been left on the side of the road. And yes, Your Honor, it's correct, although cars can park on Colorado Boulevard and the government didn't establish that cars cannot park on Eagle Rock Boulevard, the concern here is that the officer had a duty to safeguard the vehicle. And that duty goes beyond his responsibility to the legal owner of the vehicle, but also to the public. The officer had a duty to make sure that he was not responsible for leaving a vehicle for an undetermined amount of time on the side of a road because inherently leaving it there made it susceptible to theft or vandalism. That's true of any vehicle parked on almost any street. It's true, Your Honor, and there has never been. And I would like to highlight a case. So why do we have this law? Why do we have all these requirements, and the government has the burden of proof, of showing all these elements under the community caretaker exception to warrantless search if it's so inherent that any time there's just a car parked on the side of the road, the police should have the right to take it? Well, it's not inherent. I'm not hearing your argument too far. Because what you're really arguing, if you follow it down the road, is that the police can impound a car any time that's parked on the street. No, Your Honor. And I would like to highlight two things. Go ahead. One, there is case law that supports that when there is no one to lawfully take possession of the car, and two, that the car would be unattended on a public street or parking lot for an undetermined amount of time, that the officers aren't empowered to impound the vehicle. But you're right. There has to also be a showing that there was some duty on the part of the officer to safeguard that vehicle. In a case like Miranda, where the car was already parked in her driveway, or Caceres, where the car was already parked two doors in front of his house, then the officer had no duty. But here, on a public street where the officer had told that, that's the key difference. And that's what, in Cervantes, the extension of Caceres was, you're in a residential area. What has the government shown to prove that this is any different from if he had parked the car himself? But this is the critical difference. The defendant did not park the car there himself. He did so at the direction of the officer. And if anything would have happened to that vehicle, or if anything would have happened to the community because of the drugs that were left in the vehicle getting in the hands of vandals, the Los Angeles Sheriff's Department would have been responsible. But you could make all these stories up. But you haven't proved the public, whatever it is, safety exception. Now, is that the one you're relying on? You're relying on that exception here. Yes, Your Honor. And the burden of proof is on the government. Yes, it is, Your Honor. And I don't think you've met that burden. And I would also like to just draw the Court's attention to a longstanding First Circuit case, the United States v. Ramos-Morales. You see, there were other things. Now, you relied exclusively on that. There were, you know, there were a lot of other ways you could have stopped. It would have been a lot wiser to have gotten a warrant after you arrested him to search the car if he had probable causes. He said he did. Yes, Your Honor. The government was relying on a long line of case law that showed that a community caretaking could be met in a situation such as this. The government believes that this case is materially indistinguishable from a long line of cases that say that when you have this situation, an unlicensed driver, a public street, and a car that's going to be abandoned, it's within the officer's duty. The car, we don't know the car is going to be abandoned. Well, even if it's... I think the policy today is that you have to make the sheriff's department has got to make an effort to locate someone who can come there who's got a driver's license who can drive the vehicle away so it doesn't have to be impounded and so people aren't going to be required, if they want their car back, to pay a huge sum of money to the impound lot. Well, certainly the policy... Here you have surveillance going on. They see this man going in through the side, goes through the back. He's there for a little over 30 minutes. He comes out. He's got a black bag. It seems to be weighted. And then he gets into the cab of the pickup truck. And there's a strong implication that he's carrying drugs in there. He's coming out of a drug place. And so the black and white is advised. The black and white follows him. The tellers then had certainly some information that criminal activity was afoot. You've got to use this Terry stop. Just pulled him right over. And checked it out for weapons or other violation of the law. But that wasn't relied on. You've got the vehicle exception to the Fourth Amendment. That wasn't relied on. Yeah, that's the other one. Exigent circumstances since they had suspicions there was drugs. Just unprofessionally handled. Yes, Your Honor. And because it was, I've got a big thick file on this. We spent hours on trying to untangle this and figure out where did this stop take place? We don't, I don't know that neighborhood. There were no findings made, no evidence brought in on that. And you were handicapped because the judge that heard this case was very quick. You know, he'll forgive me for saying it. He'll think that's a compliment. My dear friend, too. So. Your Honor, just before I submit, there were just a couple of more points I wanted to make for your consideration. One, I wanted to just draw the Court's attention to a longstanding case, United States v. Ramos-Morales. And I can give the clerk the citation, 981 F2D 625, First Circuit, 1992. You put it in a gum slip, you know. I've written it and I can give that to the clerk, Your Honor. Yeah, you have to fill out a gum slip. But I did want to just point to the one point that this, now Justice Breyer, then the Chief of the First Circuit said, in a situation virtually identical to this case, back in 1992, where it sounds like what the Court is holding the government to is that the officers should have. What year was that? 1992, Your Honor. And it says, to hold that busy arresting officers must leave a suspect's car behind if they lack information about the surrounding neighborhood's crime rate runs contrary to the very rationale that underlines the case law authority, for it invites the very kinds of risks that the cases hold justify empowerment procedures, such as the one here. And in that case, it was the exact same situation to this. Right. It's never been. And that's a Ninth Circuit case, and that's controlling. And this case relies on Supreme Court authority, Your Honor. It's quoting Opperman and Bertin for the exact same situation. Counsel, let me ask you this. Because Cervantes came down after Judge Reel ruled, should we send this back to him and say, look, read Cervantes and hold a proper hearing? Your Honor, and I will apologize, if the government had the benefit of Cervantes before the hearing, things would have been very different. It was the government's understanding that the case law basically was as it was described in the dissenting opinion of Cervantes, and that the government met its obligations in the district court. Right. So now are you conceding that under Cervantes, it's not, you haven't put on sufficient proof? No, Your Honor, we're not conceding. If the court has additional questions and thinks that this case should go back to the district court, we certainly support that. Why should the government have a second chance to present new evidence or new theories to the district court? There's two reasons. One, I think because of the unique posture of this case, because it was before the Cervantes decision where this court articulated a standard that, in the government's view, had been different from that which had been in the longstanding Supreme Court and Ninth Circuit precedent. But two, the government will say that, of course, every Fourth Amendment analysis turns on the facts of that particular case. This case is still distinguished from Cervantes, it's the government's view, because Cervantes follows the line of cases like Miranda and Caceres where there wasn't a duty of the officer to protect the vehicle, and the question was asked, okay, in a residential area, what have you proven to show that? But here, we're not even dealing with the residential area. No matter how you slice it, there's no dispute that we're on Eagle Rock Boulevard approaching El Paso Drive. The problem is, yes, every Fourth Amendment determination turns on its facts. There's a standard for the community caretaker exception to the warrantless search rule, and you didn't put any facts. You said Eagle Rock, and Judge Reel said no suppression. That was it. Your Honor, there were more facts than just the location. There was also the policy of the police department and the California law, which implored the officer to impound the vehicle, and had he not followed standard policy or the law, as the defendant is suggesting, he should have just left the vehicle there, that would have been contrary to what they would do in a standard case, which is what we would obviously want officers to follow. But the community caretaking doctrine, that was in effect before Cervantes. Correct, Your Honor. Yeah. And we believe that under the longstanding case law of Ramirez-Hallstrom, where there wasn't even an issue of being legally parked under Jensen, under Opperman, under Bertin, under other circuits that this Court does have sufficient evidence to hold. Let me ask you, were you the trial lawyer in this case? Were you the trial lawyer? I was, Your Honor. And I don't know if the Court would also like to hear any response regarding the second major issue, the inventory search. I think she's way over. I think we don't need to hear it. It doesn't sound like we're going to get that far. Okay. And there's also just one small thing I wanted to correct. You're 21 minutes, and we've been at this now. It's 1.20, and we have a seven-weight case that's waiting. Okay, Your Honor. So I think it's time to submit this one.
judges: Pregerson, Wardlaw, Tallman